Next case on the calendar, which is United States v. Cardenas-Mendoza. Good morning. May it please the Court, my name is Frank Leone. I'm representing the appellant in this case, Mr. Jose Cardenas-Mendoza. He was convicted of importation and possession of methamphetamine. It was a port of entry case. And we raised three issues in our appeal brief, the first having to do with the opening statement by the prosecutor, even before any evidence was taken. The prosecutor stated to the jury that there would be evidence presented that a hidden compartment found on the vehicle that Mr. Cardenas was driving appeared to have been used several times or appeared to have been used more than once, and that agents would testify that Mr. Cardenas had owned this vehicle for approximately a year, and that he had entered into the United States on a number of occasions. At least there was disclosure to the extent that there was some evidence that he had entered repeatedly into the United States. There was no allegation in the indictment other than what was charged for September the 22nd of 2005 to suggest that Mr. Cardenas had ever entered into the United States smuggling drugs. But that statement by the prosecution we submitted prejudiced the jury even before any evidence was taken. And I move for mistrial and the judge acknowledging that the statement was very suggestive and extremely prejudicial, in her words. And she banned the government from introducing any evidence on it, and she offered to give a curative instruction. Why doesn't that render any error harmless? Well, because it's like trying to unring the bell. Once the statement is made, even if the jury is instructed that they shouldn't consider that kind of a statement. I declined having it referred to again by a jury instruction. But even before – when there's absolutely no evidence and the prosecution knows that there's no evidence, to allow the prosecution to make that kind of a statement at the outset of a trial when the jury is probably at its most attentive, I submit to the Court, does prejudice the defendant regardless of what is told to the jury by a jury instruction or regardless of what evidence actually comes in. It's very clear, and even the judge acknowledged or mentioned, that that kind of a statement is extremely prejudicial. Prior to opening statement, did the judge advise the jury that the statements at counsel are not evidence and that they shouldn't be taken as evidence? Or after opening statements? That is true. The judge does make that instruction. She did it here. The judge did it here, correct? She did do it in this instance. She did say that it wasn't evidence. But I think you've got to be realistic, I think, when the jury is told, for example, that the defendant has crossed over into the United States on several occasions and that even though there may not be any evidence presented and there's no argument, if you will, by the prosecution that Mr. Gardenis is a repeat offender, that when that kind of a statement is made and the jury knows that he's entered the United States several times, and here there was actually that was primarily the issue as to whether or not he knew that there was methamphetamine in that vehicle. And so I think altogether, Mr. Gardenis, taking all that evidence together or all those statements together, it was impossible for him to receive a fair trial having made that statement and then just leaving it out there without, even if you instruct the jury, as I say, it's like trying to unring the bell at that point. I think the prejudice is done. And it would have been the most appropriate time, actually, to declare a mistrial rather than after evidence has begun to be taken and you have to start all over again if, in fact, there is a mistrial granted later on. As I mentioned, there was certainly no disclosure and, in fact, the prosecution agreed that they didn't have any such evidence. I think it was overreaching by the prosecution to think that this was going to be able to testify that way. And for those reasons, I would submit to the Court that there was an abuse of discretion in failing to grant a motion for mistrial at that point and then having Mr. Gardenis submit to a trial, having had the jury tainted in that fashion, even though no evidence was later presented. We've also raised the issue of whether or not the Court abused its discretion in failing to disclose or order the disclosure of what's called a text report. The text report is a Treasury Enforcement Communications System. That was one of the reasons why this vehicle was stopped in the first instance. There was some testimony about that. And, in fact, it was referred to by the officers who attempted to interrogate Mr. Gardenis later. They told him that they had received information that he was going to be crossing in this vehicle. As I understand, the reason that you wanted it is that you wanted to show that there was a possibility that someone else had used the truck. Is that right? That's correct, Your Honor. So when the judge viewed it in camera and said, it doesn't implicate anybody else, why didn't that satisfy your concern? Well, because we don't know exactly what it is. It's difficult for me to make that kind of an argument, having never seen the text report. But if what the judge said is true, what basis do you have for arguing that you should have gotten the text report anyway? Well, the defense that Mr. Gardenis advanced was that he had loaned this vehicle out earlier in the day. The person had kept it for several hours and that had returned it to him shortly before he attempted to cross the border, and that he didn't know that there was methamphetamine in the vehicle. If, in fact, the information was, and I'll tell the court, I practiced in Arizona for a number of years, and sometimes they disclose the text messages and sometimes they don't. But usually it's in the nature of this vehicle is going to cross and it probably has drugs in it. And in some instances it's a lot more detailed than that. In some instances I've seen where, in fact, they say the person who's going to be driving is X. And in one instance in particular, in fact, it wasn't X that was crossing the vehicle. The reason I wanted that information is to cross-examine the agents who said that they asked or told Mr. Gardenis that this, that they had received information this vehicle was going to be crossing and that he was going to be driving, and that presumably there was some drugs in the vehicle. Because their testimony was that when they told Mr. Gardenis that he was going to, that they had gotten information that he was going to be crossing in this vehicle, he spontaneously said, what drugs? And that they, the agents testified that they had never mentioned any drugs and that that suggested there was some guilty knowledge by Mr. Gardenis that he was aware of the contents of the vehicle, that there were some drugs that were in it. I thought that that information was important for me to be able to cross-examine the agent as much for what might have not been included in that text message as for what was included in that text message. And because they, in essence, said there is no mention of drugs in this text message, but if you look at the case law on text, there's all kinds of information that can be used or can be inserted into the text system and is used by agents or customs in order to stop a vehicle at the border. And I think it's an important tool for a defense to be able to present their, to prepare for the defense in order to cross-examine any witness who's relying on that to justify a stop or interrogation of a suspect, as was done in this instance. As I say, I'm not quite sure why the prosecution decided they didn't want to disclose the text message in this instance. They admitted that there was nothing in there to suggest that any informant might be compromised or that there would be or a danger would be presented to any kind of an informant. But I thought it was an important tool that I could have used and should have been able to use to cross-examine both Mr. Huerta and the other agent who participated in the investigation in this case. The last issue that we raised is with regard to the loss of grand jury transcripts on what was the case agent in this case, Mr. Huerta. He was the primary agent who had contact with Mr. Contreras when he was first ---- Let me ask you about that, Mr. Leone. You concede the government wasn't at fault. In losing this grand jury testimony? Yes. All right. And you had Huerta's September 22 notes, did you not, to cross-examine? I did. Well, isn't that sufficient to substitute for the loss of the grand jury testimony? We don't believe it is. And why not? Because a grand jury testimony is under oath. It can include questions by the grand jury regarding what Mr. Huerta's investigation revealed. None of that was made available to me. And Section 3500 of the Jenks Act says that that material is a statement by the witness which should be disclosed upon request by the prosecution or by the defense. I will tell the Court ---- Well, you had everything that the government could provide that it was not responsible or at fault for losing. Well, here's the problem with that. Mr. Gardenas was arrested on September 25, 2005. On September 29, we requested the production of Jenks Act. In the District of Arizona, there is a procedure where we waive the preliminary hearing, the government agrees to produce the Jenks Act material before trial. On September 29, not even, well, about a week after his arrest, I requested that the prosecution disclose all Jenks Act material as well as disclose a lot of other material as well. Mr. Lunsford, the court reporter, died in December. I got no response to my letter. And finally, I did talk with the prosecutor about my request for the grand jury transcripts. And he told me at that point that they had learned that was the court reporter, that he had died in December of 2005. When was this request made? I made the request on September the 18th of 2005. No, no, I understand that. And then Lunsford died in December. Correct. Okay. And then this conversation that you're now referring to occurred when? It occurred either in late December or in early January. It was after Mr. Lunsford had died. All right. And I learned, it's not in the record, but I did learn it from the prosecutor in a telephone call. And at that point, I requested, I believe I requested that after I had done some research that Mr. Lunsford were to be precluded from testifying because they didn't have his grand jury transcript. It's at that point that the prosecution reveals that, in fact, Mr. Lunsford had been the court reporter, that he had died back in December some four months earlier, and that there was, they couldn't produce the transcript because they weren't even able to obtain a recording. I guess Mr. Lunsford did not keep very good records. Do we have in the record your request in September of 2005 of the drank sack materials? Yes. It is court document 18. It's an appendix to my request to compel disclosure. In fact, it was done in April of 2006. I had sent the letter several months earlier, but I appended it. And do we have the standard practice in Arizona that you've just described? I allege that that's the case in the motion to compel disclosure. And it's not contradicted by the prosecution, but I'm sure Mr. Furt will tell you that's the standard practice in Arizona. And the motion is in the record. Correct. Correct. And in fact, in my letter to the prosecution requesting production of the drank sack material, I asserted that the reason we were requesting it was because we had waived the preliminary hearing, as is the standard practice in Arizona. Is it the standard practice also for the government within, I don't know, 10 days or 15 days to produce all documents, or do they usually wait to see if there's a plea? Well, it is — I don't think there is a standard practice. I routinely will request production of drank sack after my client has waived preliminary hearing. But when the State or when the government decides to produce it as a different matter altogether, I will tell the Court that this case, because of the facts, appeared to be on track towards a disposition — a non-trial disposition. So I didn't press the issue. When it appeared that it wasn't going to resolve without a trial, that's when I contacted the prosecution and asked about the production of the grand jury transcripts. One other question on this line. Why, even if it was error to permit Cuerta to testify in light of all the other evidence in this case, why wasn't the error harmless? Well, as I say, the defense was, did Mr. Gardenas know the contents of the vehicle? And the evidence of that was the testimony by the agents that Mr. Gardenas said what drugs in response to nothing in particular, other than the comment that we knew you were coming across and driving this vehicle. Mr. Gardenas testified when we were in trial, that when he said that, he had heard one of the agents testify or make a statement that they had found drugs in the vehicle. So the credibility of Mr. Gardenas was very much an issue. And I think if I had been able to cross-examine Mr. Cuerta with his grand jury transcript, which would have been under oath, if I had been able to obtain the text report which Mr. Cuerta conceded that he relied upon in order to conduct the questioning of Mr. Gardenas, those materials, I think, would have entitled me or enabled me to present, certainly, a challenge to any credibility of either Mr. Cuerta or I think there was another officer who was involved as well. So it was a close question, in my opinion, as to whether or not. But you did have Cuerta's statement that was written notes, I'm sorry, notes that were essentially contemporaneous with the arrest of the defendant. Yes. I don't know whether they were as complete as maybe his testimony at the grand jury might have been or exactly what it is that he told the grand jury or whether the grand jury asked questions that he responded to and other statements that he may have made. And I think that's one of the reasons why it's important to have grand jury testimony. That's sworn testimony under oath in front of people that are asking questions. And it's not just an officer writing down what he thinks is pertinent in the case. And certainly in this type of an instance where you don't have a statement by a defendant readily admitting culpability, the context of what is said or what is alleged to have been said is particularly important and the credibility of that officer as well as the defendant are important. Those are materials that I think would have been very important in this case. And they denied Mr. Cuerta a fair trial in this instance. Thank you, counsel. May it please the court. My name is Bruce Ferguson, United States attorney on behalf of the government. Basically you have three issues in front of you, all of which revolved around admission of evidence or the very first issue was a denial of a mistrial, all of which are reviewed for abuse of discretion. So the court is looking deferentially at what the district court did in this case. Now, with regard to the first issue concerning the remarks that were made in opening statement, first of all, listening to counsel's argument, it sounds like he's essentially asking this court to presume that jurors are incapable of following their instructions, which, of course, the Supreme Court and this court has repeatedly said is not the case. But before this statement was ever made, the district court had told the jurors what counsel's say in their statements is not evidence. You cannot rely on that for your verdict. And that exact same instruction was reiterated at the end of the case. So we have what was anticipated to be evidence. There was no evidence actually introduced because of the district court's ruling, but there was evidence that this agent was going to say, well, having looked at the various photographs, I think that I can see these photographs. There's a lot of evidence that suggests that this agent was going to say, well,  looking at. But this agent was going to say, well, there's multiple layers of adhesive, which would suggest multiple usages and so forth. So there was going to be evidence. It did not come in. No, because it was a surprise to everyone. But as I pointed out the intent was apparently to ambush the court and the defense with this. I would dispute that that was the intent, Your Honor. Rule 404B says upon request from the defense, then you make advance notice of 404B type evidence. There's some hint or some suggestion to the defense that the government's planning to do that. Well, I was on trial counsel, but the record indicates that all of the material that was available to the government, including the reports and photographs from which that conclusion was drawn, was in fact disclosed. It's simply that in the immediate pretrial preparation, the agent looked at it and said, hey, this is what I see. And so had there been a pretrial request under 404B, obviously there would have been an obligation to make that kind of disclosure. But there was none. And so the case law that I cited to the court indicates that, in fact, there was no obligation and there was no reason to have made the disclosure in the first place. But in any event, and this is really where the district court looked at it, said, no, this is not a basis for a mistrial. I've already instructed the jury. I'm going to tell him again. I will give a specific curative instruction if you want me to. And counsel for the defendant declined, which is his option. But it also means that he was weighing, you know, am I going to be more damaged by a specific instruction? Ignore this, which presumably the jurors can follow, or by just leaving it kind of hanging out there. And as far as whether the jurors would have relied on this, in the Monk's case, which actually cited an earlier case I pointed out to this court in the answering brief, this court has found that, well, if the government is not able to ante up and actually show evidence that it says an opening statement is going to present, the jurors are quite likely to hold that against the government. So it could not be presumed to prejudice the defendant. Bottom line, we have curative instructions, generally, yes, but curative instructions that were given. More could have been given if the defendant wanted it. He didn't. But there was tremendous circumstantial evidence against him. This whole idea that somehow this ring is going to go to all the trouble of modifying his truck in the course of five or six hours, inserting a million doses worth of methamphetamine, and then give it to him to drive across when they didn't even know where he was going, so they couldn't retrieve it. It's simply incredible. And so the evidence of trial was so overwhelming of actual guilt. So if it was so overwhelming, why did the prosecutor want to gild the lily by trying to introduce this material that hadn't been disclosed? Well, it appeared to be legitimate evidence. And certainly if you know that the compartment had been used multiple times, if in fact introduced, would have been germane. But again, here is the trial prosecutor looking in advance what he had to do, proof beyond reasonable doubt. And certainly he's going to use all the tools that seem to be legitimately available to him. The bottom line is evidence was overwhelming, no showing of prejudice. And so we can't say that the court abused its discretion in denying the mistrial. As far as the disclosure or the content of the text hit, I think that the short answer to this is Rule 16A-2, that this was a report prepared for government use in prosecution and therefore is exempt. That's basically what this court said in the Ford decision not too long ago. In somewhat similar circumstances, that was actually a report prepared by state agents who were participating in a joint investigation which ultimately ended up being prosecuted federally. And the court said those kind of reports are covered by this exception. Well, this is quite different, though, wouldn't you say? I mean, this is information that's not used for prosecution. It's used for sending people to secondary. It's hearsay. It's loose information that's not necessarily used for prosecution. If you have a tech kit and somebody passes secondary, there's nothing there. Well, if I'm remembering the wording of the rule correctly, it talks about investigation, not just prosecution. It's the whole process of getting a case, a criminal case, into trial, saying we're not going to let you just kind of helter-skelter and get all that the government has. And the trial counsel for the government explained this, that there are all kinds of subtle things that can be derived from the information these text reports about, who was saying what, when, and so forth. But the district court specifically looked at this particular text report in camera and said, you've told me you want to use this to cross-examine, and your theory is that there's maybe somebody else involved, but it doesn't name anybody else. And, of course, I provided an under seal to the court to look at for yourself. There are things that arguably could be used in kind of counterintelligence and figuring out what the government is doing. And when the government counsel said, we don't know that there's anything in there that the defendant could use to expose a CS. Well, that's reasonable. We don't know exactly what the defendant knows about who he told about what he was doing, when he was going to do it, where the modification of the truck had taken place or the loading. So we can't assume that he can't figure out something if those reports are just kind of helter-skelter being disclosed, that may in fact lead back to a source. And that's exactly why the government said, Your Honor, this really oughtn't to be disclosed. So we have basically, it's exempt from disclosure, but in any event, there's been no showing that there's anything in it that would have actually been material, which is Rule 16's requirement. He has not actually shown anything but speculation. But, of course, he didn't have it, so he didn't know. I mean, that's impossible to show. Well, that's the requirement. And there were questions, and excuse me if I forget which of you raised them, but the fact is he did have the prior notes or report, rather, of this agent to look at. There was a second agent that was involved. So he was able to cross-examine about all these things, and there was nothing which suggested any kind of inconsistency or a basis for showing that the text report would have done anything different. There was internal consistency among the notes, reports, and testimony of all of the testifying agents. So it's essentially speculative, and I refer the court back to the Santiago case that I mentioned in my brief, where a similar situation, a prison gang assault or a gang crime of some kind, other inmates were the primary witnesses, and the defendant said, well, I need to know about all these records that you correctional authorities and government have regarding the gang affiliations of those witnesses on the off chance that one of them belongs to another gang and I can use that to impeach. And this court said, no, that's just speculation. That's not a showing of sufficient facts that there's anything actually out there material and relevant to this particular case. Well, there was something outstanding here, and that is, of course, the third point that Mr. Leone has mentioned, and that's the grand jury testimony of Agent Huerta. That clearly was out there, and there is nothing, is there, in the record that establishes a connection between Huerta's September 22 notes and his grand jury testimony? Nor is there anything to suggest that there was any inconsistency, because, first of all, both Huerta himself and the other officer who was present for that interrogation both testified consistently that they had not said anything to him about him having drugs. Well, but doesn't that establish the harmfulness of the error permitting Huerta to testify? You had two witnesses testifying as to facts. That obviously has a great deal more impact than one witness testifying as to a fact. Well, but what it shows is that the defendant has failed to carry his burden of indicating if there's any prejudice, but this court doesn't even have to get to a prejudice. Well, there's clearly prejudice, isn't there, when you've got two witnesses instead of one? Only if you can show that there's something wrong with their testimony, and there's nothing in the cross-examination which was not limited. He was allowed, the defense counsel was allowed to cross-examine as much as he wanted about the reports that they had generated and so forth, and so there was wide open cross-examination. He simply did not have one particular piece of evidence which there is only speculation might have been different, and that's not enough to show prejudice. But you don't even have to get to a prejudice analysis for three reasons. First of all, the government was not under a duty to disclose under the Jenks Act which are not in its possession. And these, this transcript. There's a difference. Well, the advisory committee, when it was talking about Jenks Act and Rule 6.E1 about how grand jury records are supposed to be handled, specifically differentiated between care or custody, which, you know, the statute does say rests with the prosecutor, and actual possession. It's in my brief at page 46. The advisory committee note says that the provision that the recording or reporter's notes or any transcript prepared therefrom are to remain in the custody or control as where the notes are in the immediate possession of a contract reporter employed by the Department of Justice. The attorney for the government is in accord with the present practice. So the committee is saying custody and control doesn't mean physical possession. How are you going to get those notes transcribed unless the court reporter has them in his position? And the current practice, which then was codified in the rule, was, yes, there is, in a broad sense, custody and control by the government, because it's considered private reporting who contracts with the reporter, but not necessarily physical possession. And all of the cases that I presented to you, particularly on page 41, from a number of different circuits, have said if it's not in the physical possession of the government, we don't hold it against them that the court reporter loses the notes or it's otherwise not transcribed. As a matter of fact, I just, in reading the rule, noticed built right into 6E1 about recording the proceedings, it says the validity of the prosecution is not affected by the unintentional failure to make a recording. So here is an expression of intent, if you will, by Congress in adopting this rule, saying, if the government really, you know, had no part in losing something, that shouldn't affect the outcome, which is exactly what the defendant was trying to do in this case. He's saying, government, you didn't have control or possession of those notes. They never got transcribed. Government had control. They just didn't have possession, in your words. Right. No possession. But possession is what is required by the Jenks Act. Excuse me, control. I'm getting my words mixed. There's no duty to disclose under the Jenks Act when you're not in possession. That's what those cases say. Secondly, that provides a pretty slippery slope, doesn't it? The government could be reckless with respect to grand jury testimony. It could have that testimony lost when it was convenient to be lost. Well, if you're going to assume. If we were to take that highly technical interpretation, wouldn't that open up avenues of potential abuse? If there were any evidence of abuse or neglect in this case, that might be a grounds for treating this case differently. As a matter of fact, one of the other circuits, and I can't remember now which one it was, indicated that a concept of negligent entrustment might be appropriate in a case like this. If you have a court reporter that you're employing, knowing that he repeatedly loses notes or gets drunk and doesn't do it correctly, or something like that, then obviously then the government would have some responsibility to take further steps. But there's absolutely no history, no suggestion that Mr. Lunsford was anything less than fully competent and was bound by his contract. So strict possession isn't necessarily the end of the argument? Well, it should be if there's no possession. But secondly, 3,500 years. Well, you know, you just backtracked on that, and it's sort of an important point. I mean, if possession is the threshold issue, if it's the only issue, then isn't it true, as Chief Judge Walker said, that if the government could say, well, we don't have it anymore, and therefore circumvent the requirements of the Janks Act, they had it and they said, okay, we'll lose it on the way home. Well, I think implied in all of the cases I offered was that, in fact, it was a loss that could not reasonably be ascribed to the government, and that certainly is a reasonable rule, and it certainly would require you to affirm in this case, because there's absolutely no evidence that there's anything not in accordance with the rules or regulations or statutes that was done in this case. It was simply an unfortunate fact that Mr. Lunsford died. Also, I would like to ‑‑ there was some question about the dating of this Janks Act request and whether that somehow required something. However, that document, which was dated September the 29th of 2005, preceded the defendant even being indicted. The docket, which is page 109 of the excerpts of records, show that the defendant was not even indicted until mid‑October, three weeks later. So now you're getting all kinds of questions about a broad Janks Act request, which does not specify grand jury testimony because there hadn't even been a grand jury yet. So that certainly was not any kind of notice or requirement on the government to immediately rush out and get it transcribed, other than it would have done in the ordinary course of business. Well, the government knew even before the indictment it was going to get a request for a grand jury testimony. I would assume so at some point. But, again, there is nothing in the record. That wasn't speculation. There's nothing in the record about the ordinary practice of how promptly the government, you know, goes out and gets a grand jury testimony transcribed when often a trial date ‑‑ But haven't you just told us that Mr. Leon made a request for the grand jury testimony even before the indictment? He made a Janks Act request, which can be construed to include the grand jury testimony, but it wasn't specified. So I don't think it's fair. Well, I don't think the government objected to the request on the basis that it didn't include the grand jury testimony, did it? That's something new that you're raising today. It wasn't something that there was no reason for it to object. We didn't have to disclose it in the first instance because it was a grand jury, but that wasn't the objection made below. There was no reason. The only reason I'm addressing that is because it's being suggested in this court that somehow the fact that there is this broad Janks Act request necessarily required the government to immediately, before Mr. Lunsford unforeseeably died, go out and get a transcript, other than it might have done in the ordinary course of business. And there simply is no record, and frankly, I strictly do appeals, I don't try the cases, so I'm not familiar with their internal procedures about how quickly in the ordinary course of business they go out and get those transcripts. Well, I understood that part of your argument. When you went on to say the Janks Act request didn't include grand jury testimony, you lost me, because there was no objection made by the government to saying the scope of the request didn't include this material below. So why should we countenance that objection here for the first time? The district court didn't rule on it. The other defense didn't have a chance to respond to it. I did not mean to suggest that it was a basis for a specific objection. I'm simply saying that as far as notice to the government, you need to do something right away, that that cannot be imputed to a generalized request of this nature, which did not even specifically refer to the grand jury notes or transcript in particular. Any further questions? Anything you want to add in closing? Actually, I did, if I can get myself back on track here. Just very briefly, as far as the Janks Act requirements, actually the statute says that there's only a violation if there's been a government order, which the government, excuse me, a court order, which the government then elects not to comply with, neither of which occurred in this case. There was no court order, nor did the government elect. It was beyond its control in order to provide these materials. And as far as Rule 6E, which we talked about briefly, that rule is out there, but there's been no authority presented that even if there was a violation, which we contend there was not, that such a violation would be a basis for suppressing testimony. That's never been done that I could find, nor has there been any authorities offered by the defendant, which seems like a very extreme remedy to say you can suppress all the testimony of a witness based on this entrustment, which has not been shown to be negligent or out of accordance with standard practice in any way. Thank you, counsel. We'll give you two minutes for rebuttal. First of all, it's obvious that you can always instruct a jury to disregard what's been said or heard, but there are numerous cases where that's just simply not an adequate remedy, and we submit that that's what happened in this instance. You get that kind of a statement out there. The problem was the judge offered to give a pinpoint, you know, to give a specific curative instruction. You declined. That's true. But my point is you could have zeroed right in. She could have zeroed right in, or the judge could have zeroed right in on the issue and said there will be no evidence along these lines. Disregard what the prosecutor said? That's probably true, Judge. But when you start out a trial, I think the jury is, as I say, is most attentive. It's interested in the case. You hear that kind of a statement, it's going to be very difficult to overcome, I think. Secondly, with regard to these two agents that testified, my recollection is that there was only one report and they both testified off the same report, and that was Agent Werther's report. So to the extent that those witnesses might have been inconsistent or remembered things differently, probably not likely in this instance because they both relied on the same report, Agent Werther's report, in preparing for their testimony. Finally, with regard to the Rule 6 matter, the rule entrusts the prosecution with the responsibility of keeping those notes, recordings, et cetera. And the reason it does so is because, I suspect, because it's important that they be kept confidential. These are grand jury proceedings. And, yes, I understand that. If there was only one report by both agents. Correct. The September 22 report. That's my recollection of it. All right. And both agents testified about that report. Correct. So how does that establish any inconsistency that might have developed had you had available Agent Werther's grand jury testimony? Well, that's just my point. It doesn't establish any inconsistency because it seems to me that Mr. Ferg is arguing, you have both of these witnesses that are testifying and they testify consistently. How is that inconsistent with what might have happened in front of the grand jury? My point is that they're both testifying off the same report. And they both prepared looking at the same report. And so it's obvious that they're going to testify consistently at trial. How Mr. Werther may have testified in front of the grand jury, we'll never know because that grand jury transcript is lost and his testimony is lost. Well, but isn't it speculative that, as Mr. Ferg has said, that there would have been some inconsistency? Well, we just don't know, I guess, is the problem here. The last thing I wanted to point out is this. In fact, if you read the transcript regarding the discussion that we had about the loss of the grand jury testimony, it wasn't just Mr. Cardenas Mendoza's grand jury transcript that was lost. There was a number of other cases that were lost. In fact, there was whole dates that were missing. So there is at least some evidence that there may have been a negligent entrustment here. Because there were, even though they were able to go back to Mr. Lunsford's office, there were some dates that were not found at all. There were recordings that were not found. I think they managed to find quite a few of them. But the extent or the number of recordings that were lost certainly suggests that Mr. Lunsford didn't keep good records and that there may have been some negligent entrustment by the prosecution in this case of its duties under Rule 6.  Thank you.
judges: Thomas, Paez, Walker